**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

AMERICAN AUTOMOBILE INSURANCE
COMPANY,

        Plaintiff/Counterdefendant,

v.                                   No. 13:CV-439 MCA/LF

FIRST MERCURY INSURANCE COMPANY;

        Defendant/Counterclaimant

and

XL INSURANCE COMPANY LIMITED and
HCC INTERNATIONAL INSURANCE COMPANY PLC,

        Joined Plaintiffs on Counterclaim.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** is before the Court on American Automobile Insurance
Company's (AAIC's) *Motion for Summary Judgment on Priority and Applicability of
Insurance Coverage and No Liability* [Doc. 116] and First Mercury's *Motion for
Summary Judgment on AAIC's Affirmative Claims for Relief* [Doc. 117]. The Court has
considered the parties' submissions and the relevant law, and is otherwise fully informed.
For the following reasons, the Court **DENIES** AAIC's *Motion* and **DENIES in part** and
**GRANTS in part** First Mercury's *Motion*.

## I.    Background

## A.  The Accident

The following facts are undisputed.  [*Compare* Doc. 117, ¶¶ 1-9 (asserting these facts) *with* Doc. 127, ¶¶ 1-9 (not disputing these facts)]  In March, 2010, Kevin Udy was killed in an accident in which his pickup truck collided with a trailer being hauled by a tractor driven by Monte Lyons.  Lyons was an employee of Standard E & S, LLC (Standard) and the tractor and trailer were owned by Zia Transport, Inc. (Zia).  A year later, the personal representative of Udy's estate, along with Udy's wife and eight children, filed a wrongful death action against Lyons, Standard, and Zia (the Udy Action).  The plaintiffs also named Defendant Bergstein Enterprises, Ltd (Bergstein), the management company for Standard and Zia, as a defendant in the Udy Action.  [Doc. 117-1 (*Udy Action Complaint*)]  An amended complaint was later filed.  [Doc. 117-4]

In the *First Amended Udy Complaint*, the plaintiffs alleged that "[a]t the time of the crash, Bergstein operated defendants Standard . . . and Zia, and is liable to plaintiffs under the doctrines of respondeat superior and agency."  [Doc. 117, ¶ 8 (asserting this fact); Doc. 127, ¶ 8 (not disputing this fact); *First Amended Udy Complaint*, Doc. 117-4, ¶ 41; *see also* Doc. 116, ¶¶ 1-3; Doc. 131, ¶¶ 1-3]  They also alleged that

> 45. In addition to failing to properly train, supervise, and manage defendant Lyons and other drivers, defendants Bergstein, Standard . . ., and Zia acted intentionally, recklessly, willfully and/or with wanton disregard for the safety of others because they allowed, and on information and belief encouraged, a pattern and practice of overworking their employees, failing to train, inspect and maintain their vehicles, and failing to comply with State and Federal safety standards and regulations.

> 46. Among other things, these Defendants knew and allowed the following:

    a. Numerous violations of drivers lacking the knowledge of Federal Motor Carrier Safety Regulations;

    b. Numerous violations of drivers for failing to comply with traffic control devices;

    c. Numerous violations of the Federal Motor Carrier Safety Regulations;

    d. Continuously operating their vehicles without required inspections;

    e. Continuously operating their vehicles without proper registrations;

    f. Continuously operating their vehicle without proper repair and maintenance;

    g. Otherwise operating their vehicles in a dangerous condition.

47. Among others, these intentional, reckless and/or willful acts and omissions of the above defendants, either singularly or in combination, were a proximate cause of the Plaintiffs' injuries and damages. Accordingly, defendants are liable for punitive damages.

[Doc. 117, ¶ 9 (asserting this fact); Doc. 127, ¶ 9 (not disputing this fact); *First Amended Udy Complaint*, Doc. 117-4, ¶¶ 45-47]

## B. The Insurance Policies

Three different insurance policies are at issue. Two were issued by AAIC and one by First Mercury.

### i.  *AAIC's Standard Policy*

The tractor and trailer driven by Lyons were listed as covered autos on an insurance policy issued by AAIC to Standard (the AAIC Standard Policy). [Doc. 116, ¶ 7 (asserting this fact); Doc. 131, ¶ 7 (not disputing this fact); Doc. 116-4, Exh. 58, pg. 7-8] The AAIC Standard Policy provided primary liability coverage up to $1 million. [Doc. 116, ¶ 8 (asserting this fact); Doc. 131, ¶ 8 (not disputing this fact); Doc. 116-4,

Exh. 58, pg. 5]  Standard was the Named Insured on the AAIC Standard Policy.  [*Id.*]  In addition, Section II.A.1.b of the AAIC Standard Policy provided that

> [t]he following are insured:
>
> a.   You for any covered auto.
>
> b.   Anyone else while using with your permission a covered auto you own, hire or borrow except . . .
>
> c.   Anyone liable for the conduct of an insured described above but only to the extent of that liability.

[Doc. 116, ¶ 9 (asserting this fact); Doc. 131, ¶ 9 (not disputing this fact); Doc. 116-4, Exh. 58, pg. 20-21]  The AAIC Standard Policy also contained the following "other insurance" provision.

> a. For any covered auto you own, this Coverage Form provides primary insurance.  For any covered auto you don't own, the insurance provided by this Coverage Form is excess over any other collectible insurance. However, while a covered auto which is a trailer is connected to another vehicle, the Liability Coverage this Coverage Form provides for the trailer is:
>
> > (1) Excess while it is connected to a motor vehicle you do not own.
> >
> > (2)  Primary while it is connected to a covered vehicle you own.

[Doc. 116, ¶ 10 (asserting this fact); Doc. 131, ¶ 10 (not disputing this fact); Doc. 116-4, Exh. 58, pg. 28]

### ii.    *First Mercury's Standard Policy*

First Mercury also issued an insurance policy to Standard (the First Mercury Standard Policy).  [Doc. 116, ¶ 11 (asserting this fact); Doc. 131, ¶ 11 (not disputing this fact); Doc. 116-6, Exh. 67, pg. 3]   The First Mercury Standard Policy was titled "COMMERCIAL EXCESS LIABILITY DECLARATIONS" and named the AAIC

Standard Policy as the "Underlying Insurance." [Doc. 116, ¶ 12 (asserting this fact);

Doc. 131, ¶ 12 (not disputing this fact); Doc. 116-6, Exh. 67, pgs. 3, 5]  The First

Mercury Standard Policy provided that

> The Company shall provide the Named Insured with insurance excess of
> the Underlying Insurance scheduled in the declaration page of this policy.
> Except as specifically set forth in the terms, conditions or endorsements of
> this policy, coverage hereunder shall apply in conformance with the terms,
> conditions and endorsements of the Underlying Insurance.  Coverage
> hereunder shall attach only after all Underlying Insurance has been
> exhausted by actual payment of claims or losses hereunder.
>
>         . . .
>
> In the event of exhaustion of the Underlying Limit in any Underlying
> Insurance, this policy shall continue in force as primary insurance, subject
> to the terms, conditions and endorsements of this policy. . . .

[Doc. 116, ¶ 12 (asserting this fact); Doc. 131, ¶ 12 (not disputing this fact); Doc. 116-6,

Exh. 67, pg. 8]  The limit for this policy was $4 million.  [Doc. 116, ¶ 12 (asserting this

fact); Doc. 131, ¶ 12 (not disputing this fact); Doc. 116-6, Exh. 67, pg. 3]

### iii.    AAIC's Bergstein Policy

Finally, AAIC issued a policy to Bergstein as a Named Insured with a $1 million

limit (the AAIC Bergstein Policy).  [Doc. 116, ¶ 14 (asserting this fact); Doc. 131, ¶ 14

(not disputing this fact); Doc. 116-5, Exh. 60, pg. 1]  Neither the tractor nor the trailer

was listed on the AAIC Bergstein Policy.  [Doc. 116, ¶ 15 (asserting this fact); Doc. 131,

¶ 15 (not disputing this fact); Doc. 116-5, Exh. 60, pg. 7]  The AAIC Bergstein Policy

included an "other insurance" clause that provided that

> [f]or any covered auto you own, this Coverage Form provides primary
> insurance.  For any covered auto you don't own, the insurance provided by
> this Coverage Form is excess over any other collectible insurance.

However, while a covered auto which is a trailer is connected to another vehicle, the Liability Coverage this Coverage Form provides for the trailer is:

> (1) Excess while it is connected to a motor vehicle you do not own.

> (2)  Primary while it is connected to a covered vehicle you own.

[Doc. 116, ¶ 16 (asserting this fact); Doc. 131, ¶ 16 (not disputing this fact); Doc. 116-5, Exh. 60, pg. 17]

## C.  The Settlement Negotiations and Trial Verdict

Although the parties disagree as to whether AAIC properly tendered the policy limits on the AAIC Standard Policy to First Mercury, they agree that First Mercury took the lead in settlement negotiations with the Udy plaintiffs.  [Doc. 116, ¶¶ 18-19, 21 (asserting that AAIC tendered its limits on the AAIC Standard Policy to First Mercury and that First Mercury "took control" of the negotiations); Doc. 131, ¶¶ 18-21 (disputing that AAIC properly tendered its limits but agreeing that First Mercury "took over the primary role" in negotiations); Doc. 116-2, Exh. H & I, pgs. 25-27]   During the negotiations, First Mercury offered the Udy plaintiffs the $1 million available under the AAIC Standard Policy, but did not offer the entire $4 million available under the First Mercury Standard Policy.  [Doc. 116, ¶ 27 (asserting these facts); Doc. 131, ¶ 27 (not disputing these facts); Doc. 116-2, Exh. J, pg. 29; Doc. 116-6, Exh. 133, pg. 20]   No funds from the AAIC Bergstein Policy were offered during negotiations.  [Doc. 131, pg. 11, ¶ Y (stating that AAIC offered the Bergstein Policy limit after the verdict); Doc. 138, pg. 6, ¶ Y (not disputing this assertion); Doc. 131-9]

After a jury trial, judgment was entered against Standard, Zia, and Bergstein for a total of $58 million, including $30,300,000 against Standard and $22,050,000 against Bergstein.  [Doc. 116, ¶ 29 (asserting these facts); Doc. 131, ¶ 29 (not disputing these facts); Doc. 116-3, Exhs. 1-2]  The case was then settled for $43 million, which was paid as follows:  $1 million by AAIC pursuant to the AAIC Standard Policy; $4 million by First Mercury pursuant to the First Mercury Standard Policy; $1 million by AAIC pursuant to the AAIC Bergstein Policy; $4 million by Commerce and Industry pursuant to an excess policy to the AAIC Bergstein Policy, which is not at issue here; and $33 million by First Mercury and its liability insurers.  [Doc. 116, ¶ 30 (asserting these facts); Doc. 131, ¶ 30 (not disputing these facts)]

## D.  The Present Matter

AAIC filed a *Complaint for Declaratory Judgment, Bad Faith, and Equitable Subrogation* against First Mercury, Standard, Zia, and Bergstein, as well as the Udy plaintiffs.  [Doc. 1]  The *Complaint* alleged that First Mercury breached its duty of good faith and fair dealing by failing to settle with the Udy plaintiffs within policy limits, and that AAIC is entitled to equitable subrogation and declaratory relief.  [Doc. 4]  In its suit, AAIC seeks $1 million, which represents the amount of the AAIC Bergstein Policy that AAIC paid as a result of First Mercury's failure to settle the Udy Action within the limits of the AAIC Standard Policy and First Mercury Standard Policy.  [Doc. 4, ¶¶ 30-32]  In the *First Amended Complaint for Declaratory Judgment, Bad Faith, and Equitable Subrogation (First Amended Complaint)*, AAIC dismissed the Udy plaintiffs, leaving First Mercury, Standard, Zia, and Bergstein as defendants.  [Doc. 4]  This Court then

dismissed Standard, Zia, and Bergstein on the ground that AAIC failed to state a claim against them.  [Doc. 33]  Thus, First Mercury is the only remaining defendant.  [*Id*.]

First Mercury answered the *First Amended Complaint* and counterclaimed against AAIC, alleging that AAIC acted in bad faith by, inter alia, failing to notify First Mercury of the AAIC Bergstein Policy.  [Doc. 13]  XL Insurance Company Limited and HCC International Insurance Company PLC joined as plaintiffs on the counterclaim.  [Doc. 143]  First Mercury maintains that, if AAIC had disclosed the AAIC Bergstein Policy earlier in the negotiations, "the Udy Action likely would have settled prior to trial within policy limits."  [Doc. 13, ¶ 25]  First Mercury seeks equitable and punitive damages.  [Doc. 13, ¶¶ 28, 32]  Both parties now move for summary judgment.  [Doc. 116; Doc. 117]

## II.  Discussion

## A.  Governing law

Because this is a diversity case, the choice-of-law principles of the forum state control.  *Rupp v. Transcon. Ins. Co.*, 627 F. Supp. 2d 1304, 1314 (D. Utah 2008).  In New Mexico, "the law of the place of the contract, the *lex loci contractus,* applies to interpret the terms of the contract,", whereas tort claims are governed by the law of the place of the wrong.  *Wilkeson v. State Farm Mut. Auto. Ins. Co.*, 2014-NMCA-077, ¶ 5, 329 P.3d 749.  First Mercury maintains that the policies here were executed in Texas and Texas law applies to construction of the policies.  [Doc. 117, pg. 12]  AAIC argues that New Mexico law applies because the parties so stipulated.  [Doc. 127, pg. 10; Doc. 36

The Court will apply New Mexico law. The parties stipulated to New Mexico law in the Joint Status Report, and First Mercury, in its *Amended Answer*, requested a jury trial "under New Mexico law." [Doc. 36; Doc. 13] Moreover, neither party has identified, nor has the Court encountered, any conflict between New Mexico and Texas law as to the issues presented here. Where there is no conflict, the Court applies the law of the forum state. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 816 (1985) ("There can be no injury in applying [the forum state's] law if it is not in conflict with that of any other jurisdiction connected to this suit."). Finally, throughout its pleadings, First Mercury has relied on New Mexico law. [Doc. 117, pg. 13, 18; Doc. 146, pg. 5, 6, 10] By doing so, First Mercury acquiesced to application of New Mexico law. *ACC Consultants, Inc. v. Logistics Health, Inc.*, No. CIV. 09-1145 JP/RHS, 2011 WL 5212262, at *8 n.3 (D.N.M. Feb. 25, 2011).

## B. Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under this Rule, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Rather, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248. Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th

Cir. 1993) (citations omitted).  The moving party need not negate the nonmovant's claim, but rather must show "that there is an absence of evidence to support the nonmoving party's case."  *Celotex v. Catrett*, 477 U.S. 317, 325 (1986).  Once the moving party meets its initial burden, the nonmoving party must show that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof."  *Applied Genetics Int'l Inc. v. First Affiliated Secs., Inc*., 912 F.2d 1238, 1241 (10th Cir. 1990) (citation omitted).  The nonmoving party cannot rely upon conclusory allegations or contentions of counsel to defeat summary judgment, *see Pueblo Neighborhood Health Ctrs., Inc. v. Losavio*, 847 F.2d 642, 649 (10th Cir. 1988), but rather must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial,'" *Celotex*, 477 U.S. at 324.  If the responding party fails to properly address the movant's assertion of fact as required by Rule 56(c), a district court may "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it."  Fed. R. Civ. P. 56(e)(3).  Upon a motion for summary judgment, a district court "must view the facts in the light most favorable to the nonmovant and allow the nonmovant the benefit of all reasonable inferences to be drawn from the evidence."  *Kaus v. Standard Ins. Co*., 985 F. Supp. 1277, 1281 (D. Kan. 1997).

## C. Key Principles of Insurance Law

Several basic principles of insurance law are applicable to the Court's analysis. These have to do with 1) distinctions between primary and excess policies, 2) "other insurance" clauses, and 3) the duties to defend, indemnify, and settle.

"Primary insurance provides 'first dollar' liability coverage up to the limits of the primary insurance contracts, usually subject to a deductible. In other words, primary insurance potentially attaches immediately upon the happening of an occurrence or accident that gives rise to liability on the part of the insured." Scott M. Seaman and Charlene Kittredge, *Excess Liability Insurance: Law and Litigation*, 32 TORT & INS. L.J. 653 (1997). In contrast, "[e]xcess insurance is secondary insurance coverage that attaches only after a predetermined amount of primary insurance . . . has been exhausted. Thus, excess insurance is comprised of the next 'layer(s)' or 'level(s)' of coverage above the primary contract or the self-insured retention." *Id*. at 656. An "excess" policy "protect[s] the insured in the event of a catastrophic loss in which liability exceeds the available primary coverage." 15 STEVEN PLITT, ET AL., COUCH ON INS. § 220:32 (3rd ed. updated 2016) (hereinafter, COUCH ON INS.).

Whereas some insurance policies become "excess" by operation of "other insurance clauses," discussed further below, true excess policies are "written by design" and are excess to a specific underlying policy. Seaman, *supra* at 657. Often such policies are "follow form" policies, which "incorporate[] and adopt[] the conditions of the policy of insurance immediately preceding it." *Rummel v. St. Paul Surplus Lines Ins.*

*Co.*, 1997-NMSC-042, ¶ 12, 123 N.M. 767, 945 P.2d 985 (internal quotation marks and citation omitted).

In addition to "true" excess policies, "[e]xcess coverage may [also] arise 'by coincidence' in the situation in which multiple primary insurance contracts apply to the same loss" through the operation of "other insurance" clauses.  Seaman, *supra* at 657. Through "other insurance" clauses, insurers "attempt to control the manner in which each insurer contributes to or shares a covered loss."  COUCH ON INS. § 219:1.  Thus, a "true" excess policy and excess coverage that arises by coincidence function very differently: "[a]n excess 'other insurance' clause purports to make an otherwise primary policy excess insurance should another primary policy cover the loss in question," whereas liability under "true excess insurance . . . attaches only after a predetermined amount of primary coverage has been exhausted."  *Id*. at § 219:33.

Critically, in order for an "other insurance" clause to be effective, the two policies at issue "must insure the same [loss] and the same interest over the same period of time." 3 GARY D. NELSON AND MARK A. LUDOLPH, LAW AND PRAC. OF INS. COVERAGE LITIG. § 38:2 (2016); *Pines of La Jolla Homeowners Assn. v. Ind. Indem.,* 7 Cal.Rptr.2d 53 (Cal. Ct. App. 1992) ("[T]he application of 'other insurance' clauses requires, as a foundational element, that there exist multiple policies applicable to the *same loss.*") disapproved of on other grounds by *Montrose Chem. Corp. v. Admiral Ins. Co.*, 913 P.2d 878, 901 (Cal. 1995).  If two policies do not cover the same loss, then an "other insurance" clause cannot operate to render one policy excess over the other.

Three types of "other insurance" clauses limit the insurer's obligation. For example, a "pro-rata" "other insurance" clause provides that "the insurer will pay its share of the loss in the proportion its policy limits relates to the aggregate liability coverage available." COUCH ON INS. § 219:5. An "excess" "other insurance" clause provides "that an insurer will pay a loss only after other available primary insurance is exhausted," and "[t]he "escape" clause . . . provides that an insurer is absolved of all liability where other coverage is available." *Id*. The "other insurance" clauses in the AAIC Standard Policy and the AAIC Bergstein Policy, shown above, are typical excess "other insurance" clauses.

Finally, as a general matter, an insurer's duty to defend is distinct from its duty to indemnify. *Ins. Co. of N. Am. v. Wylie Corp.*, 1987-NMSC-011, ¶ 18, 105 N.M. 406, 733 P.2d 854. The duty to defend is based on the allegations in the complaint. "If the allegations of the injured third party's complaint show that an accident or occurrence comes within the coverage of the policy, the insurer is obligated to defend, regardless of the ultimate liability of the insured." *Id*. ¶ 19. "The duty to defend arises prior to the completion of litigation, and therefore insurers are required to meet their defense obligation before the scope of the insured's liability has been determined. In contrast, the duty to indemnify arises only once liability has been conclusively determined." 14 STEVEN PLITT, ET AL., COUCH ON INS. § 200:3 (3rd ed. updated 2016). Thus, an insurer's duty to indemnify is based on the proof at trial, not on the allegations in the complaint.

Insurers also have a duty to settle claims when appropriate and, in doing so, must "take into account the interest of the insured and give it at least as much consideration as

it gives to its own interest."  1 ALLEN D. WINDT, INSURANCE CLAIMS AND DISPUTES §
5:1 (6th ed. updated 2017).  Once a primary insurer has tendered its limits, an excess
insurer has the same obligation to settle.  *Id*. at § 5:26.

### D. The Parties' Arguments

The parties agree that 1) the First Mercury Standard Policy is an excess policy
over the AAIC Standard Policy [Doc. 116, ¶11-12; Doc. 117, ¶ 11] and 2) the AAIC
Bergstein Policy is a primary policy with an excess "other insurance" clause.  [Doc. 116,
¶ 16; Doc. 131, ¶ 16]  The issue is whether and how the policies function together to
provide coverage.  Because the parties' arguments in their respective *Motions* overlap
substantially, the Court will begin by setting out the arguments in their entirety.

i.  ***AAIC's Motion for Summary Judgment on Priority and Applicability of Insurance
    Coverage and No Liability***

Priority and Applicability of Insurance Coverage

AAIC argues that the "other insurance" clause in the AAIC Bergstein Policy
operates such that the three policies apply in the following order: first, the AAIC
Standard Policy, followed by the First Mercury Standard Policy, then the AAIC Bergstein
Policy.  [Doc. 116, pg. 13]  AAIC's view is that the three policies form a single "tower"
of insurance with the AAIC Standard Policy as the primary policy, followed by the First
Mercury Standard Policy, then by the AAIC Bergstein Policy.  As part of this argument,
AAIC maintains that Bergstein was an additional insured under the AAIC Standard
Policy for both vicarious and direct liability (Sec. II.A.1.b and Sec. II.A.1.c of the AAIC
Standard Policy, respectively).  AAIC further argues that, based on this order, the AAIC

Bergstein Policy was not triggered until the First Mercury Standard Policy was exhausted and AAIC was not obligated to tender the AAIC Bergstein Policy "in tandem with the AAIC Standard . . . Policy." [Doc. 116, pg. 15-21].

First Mercury responds by arguing that the AAIC Bergstein Policy was not excess to either the AAIC Standard or First Mercury Standard Policies because it did not insure the same loss as those policies. [Doc. 131, pg. 12] More specifically, Bergstein was not an additional insured on the AAIC Standard Policy for its own conduct, whereas it was insured for its own conduct under the AAIC Bergstein Policy. [Doc. 131, pg. 12] Thus, the AAIC Standard Policy and the AAIC Bergstein Policy did not insure the same loss as to Bergstein's direct liability. Therefore, the AAIC Bergstein Policy was always primary for Bergstein's own misconduct and AAIC should have tendered that policy at the same time AAIC tendered the AAIC Standard Policy. [Doc. 131, pg. 20] First Mercury thus characterizes the AAIC Bergstein Policy, with excess coverage provided by Commerce and Industry, as a second, separate "tower" of insurance from the "tower" created by the AAIC Standard Policy and the First Mercury Standard Policy. [Doc. 117, pg. 20]

No Liability

AAIC also moves for summary judgment as to First Mercury's counterclaims. In its counterclaims, First Mercury alleges that both of the AAIC policies were triggered by the Udy Action, and that AAIC "never offered any portion of the [AAIC] Bergstein Policy limits prior to trial." [Doc. 13, ¶¶ 13, 18] First Mercury concludes that "[b]ut for AAIC's failure to disclose and offer the $1 [million] limits under the [AAIC] Bergstein Policy, the Udy Action likely would have settled prior to trial within policy limits."

[Doc. 13, ¶ 25]  First Mercury requests equitable relief and punitive damages for AAIC's alleged bad faith concealment of the AAIC Bergstein Policy.  [Doc. 13, ¶¶ 28, 32]

AAIC argues that First Mercury's counterclaims must be summarily dismissed because the essential fact on which they depend, to wit, that AAIC concealed the AAIC Bergstein Policy from First Mercury, is unsupported by the evidence.  [Doc. 116, pg. 21-22]  AAIC also argues that, because the AAIC Bergstein Policy was excess over the two Standard policies, it had no obligation to tender the AAIC Bergstein Policy until the First Mercury Standard Policy was exhausted, and therefore it cannot have acted in bad faith by failing to tender that policy.  [Doc. 116, pg. 23]

In response, First Mercury contends that there is a disputed question of material fact regarding what First Mercury knew about the AAIC Bergstein Policy and when it obtained that knowledge.  [Doc. 131, pg. 20-21]

### ii. *First Mercury's Motion for Summary Judgment on [AAIC's] Affirmative Claims for Relief*

First Mercury moves for summary judgment on AAIC's equitable subrogation and bad faith claims.  It argues that, as a matter of law, a primary insurer such as AAIC cannot maintain such claims against an excess insurer such as First Mercury.  [Doc. 117, pg. 11-19]  This argument hinges on First Mercury's contention that the AAIC Bergstein Policy was primary for Bergstein's own misconduct, not excess as AAIC contends.  [Doc. 117, pg. 13]

First Mercury also argues that AAIC is not entitled to declaratory relief on the theory of vertical exhaustion because 1) vertical exhaustion is not implicated in this case,

and 2) declaratory relief is inappropriate under the circumstances. [Doc. 117, pg. 20] First Mercury maintains that a vertical exhaustion analysis is inapplicable because the AAIC Bergstein Policy was primary for Bergstein's own misconduct. [Doc. 117, pg. 20] It also argues that declaratory judgment is inappropriate because AAIC is seeking damages for past conduct and "declaratory judgment is not the appropriate relief to adjudicate the effect of past actions where damages claims exist and no risk of recurrence is present." [Doc. 117, pg. 20]

In response to First Mercury's motion for summary judgment, AAIC argues that Bergstein was insured for both vicarious and direct liability under the AAIC Standard Policy and that therefore the AAIC Bergstein Policy was excess over both Standard Policies. [Doc. 127, pg. 1, 14] Hence, any rules against suit by a primary insurer against an excess insurer are inapplicable here.

AAIC also argues that, to the extent First Mercury is arguing that the First Mercury Policy provided no coverage for Bergstein at all, First Mercury must be estopped from making such an argument because First Mercury accepted AAIC's tender of the AAIC Standard Policy limits, the AAIC Standard Policy was exhausted, and AAIC relied on First Mercury's representations that Bergstein was an additional insured under the AAIC Standard Policy. [Doc. 127, pg. 11-15] First Mercury counters that AAIC has failed to establish the requirements for estoppel. [Doc. 146, pg. 5-7]

**E. Analysis**

As can be seen from this outline, the question central to many of the parties' arguments is the extent to which Bergstein was covered as an additional insured under the

AAIC Standard Policy, as that question affects whether the "other insurance" clause in the AAIC Bergstein Policy applies. The Court will first address the preliminary questions of 1) whether First Mercury is estopped from making its coverage arguments and 2) whether the AAIC Bergstein Policy's "other insurance" clause cannot operate here as a matter of law. Then it will address whether Bergstein is an additional insured for its direct liability under the AAIC Standard Policy as a "user" of the tractor and whether all three policies cover the same loss. Finally, the Court will address the parties' remaining arguments.

i.    ***Whether First Mercury Waived or is Estopped from Making its Coverage Arguments***

AAIC argues that First Mercury is estopped from claiming that Bergstein is not covered under the First Mercury Standard Policy or that First Mercury waived this argument. [Doc. 127, pg. 11, 18] *See* 7 STEVEN PLITT, ET AL., COUCH ON INS. § 101:8 (3rd ed. updated 2016) (stating that "waiver" and "estoppel" "are distinct. Waiver involves an intentional relinquishment of policy right. Estoppel applies where the insured has relied on the insurer's conduct to its detriment."). Both parties present arguments as to whether or not the elements of estoppel are met here. [Doc. 127, pg. 11; Doc. 146, pg. 5]

The Court need not address these arguments in detail, however, because the doctrines of estoppel and waiver generally do not apply in disputes between insurers. It is true that an insurer may be estopped from asserting noncoverage where the insurer has "assume[d] the defense in an action against its insured with knowledge of possible

grounds for noncoverage and that does not reserve its right to later deny coverage." *Am. Gen. Fire & Cas. Co. v. Progressive Cas. Co.*, 1990-NMSC-094, ¶ 15, 110 N.M. 741, 799 P.2d 1113. "The reason for the rule estopping the insurer from denying coverage without the reservation of rights is the presumptive potential of prejudice *to the insured* caused by the insurer's total control of the litigation, the insured's reliance on the insurer, and the insurer's fiduciary duty *vis-a-vis the insured.*" *Id*. ¶ 16. AAIC argues that it was prejudiced by First Mercury's representations that it accepted AAIC's tender and "took over" the settlement negotiations without reserving its rights. [Doc. 127, pg. 15, 18] Thus, AAIC appears to assert that First Mercury's conduct places it within this rule.

Because the purpose of the rule is to protect the *insured*, however, "[t]he rule does not operate to preclude a suit such as this whereby one insurer attempts to assert that another insurer provided primary coverage." *Id.*; *St. Paul Mercury Ins. Co. v. Lexington Ins. Co.*, 78 F.3d 202, 208 (5th Cir. 1996) (applying Texas law) ("[W]e reject the argument that [plaintiff insurance companies] waived the right to rely on their 'other insurance' clauses by failing to reserve the right to avoid coverage on the basis of those clauses."); *see Chubb Custom Ins. Co. v. Burnett & Co.*, No. CIV.A.04-0950, 2006 WL 1663820, at *6 (E.D. La. June 15, 2006) (collecting cases). The court will address First Mercury's arguments.

ii.     ***Whether the First Mercury Standard Policy is Excess over Only the AAIC Standard Policy***

In its *Motion*, First Mercury argues that AAIC's reliance on the "other insurance" clause to render the AAIC Bergstein Policy excess to the First Mercury Standard Policy

is improper as a matter of law.  It contends that "[c]ourts have rejected efforts to conflate excess policies with 'other insurance' provisions that attempt to make one policy 'excess' over another."  [Doc. 117, pg. 19]  *See, e.g.*, *LeMars Mut. Ins. Co. v. Farm & City Ins. Co.*, 494 N.W.2d 216, 219 (Iowa 1992) ("A primary insurance provider cannot hide behind an excess insurance clause in its 'other insurance' provision to require an umbrella insurer to cover liability for its insured."); *Farmers Ins. Exch. v. Fed. Ins. Co.*, No. 10-611 JP/GBW, 2011 WL 13116736, at *9 (D.N.M. Nov. 21, 2011) (stating that "a clear majority of courts, which have considered the issue . . ., have held that all primary insurance must be exhausted before an excess insurance policy is reached" and collecting cases); COUCH ON INS. § 220:41 ("As a rule, however, excess and umbrella policies are regarded as excess over and above any type of primary coverage, excess provisions arising in regular policies in any manner, or any escape clauses."); Douglas R. Richmond, *Rights and Responsibilities of Excess Insurers*, 78 DENV. U. L. REV. 29, 103 (2000) ("Excess policies clearly differ in purpose from primary policies containing excess 'other insurance' clauses, such that a prorated loss between an excess insurer and a primary insurer seeking excess status by virtue of its 'other insurance' clause is improper."). These authorities reason that primary and excess policies insure different levels of risk and operate very differently, and premiums for each level of insurance reflect these differences. *Reliance Nat. Indem. Co. v. Gen. Star Indem. Co.*, 85 Cal. Rptr. 2d 627, 639 (Cal. Ct. App. 1999).  Permitting a primary insurer to invoke an 'other insurance' clause vis á vis an excess policy would be unfair because "[a] primary insurer would be allowed to charge a higher premium for insuring a greater risk; however, then the primary insurer

would be allowed to shift the loss to an excess carrier which charged a lower premium." *Id.*

Nevertheless, this general rule does not apply when it is clear from the policy that the parties intended a different result. Indeed, even in the cases cited by First Mercury for the general rule, the courts engaged in an analysis of the insurers' intent before determining the priority of the policies. *See*, *e.g.*, *Bosco v. Bauermeister*, 571 N.W.2d 509, 518 (Mich. 1997) (stating that "in attempting to ascertain the parties' contractual intent, a court must consider the language of the policy, the character of the contract, the contract's object and purpose, and the surrounding facts and circumstances at the time of execution.").

After conducting such examination, courts have bucked the general rule in favor of giving effect to a contrary intent. For instance, in *U.S. Fire Insurance Company v. Aetna Casualty & Surety Company*, the Texas Court of Appeals held that a primary policy issued by Aetna containing an 'other insurance' clause was excess to an excess policy issued by U.S. Fire. 781 S.W.2d 394, 395 (Tex. App. 1989). In that case, the U.S. Fire excess policy applied after exhaustion of a named underlying primary policy issued by Highlands Insurance Company. *Id.* It also included an endorsement providing that "[i]n consideration of the premium charged, it is agreed that this policy shall apply regardless of the existence of other insurance that would apply on the same basis." *Id.* at 396. Aetna's policy included an "other insurance" clause that stated that its coverage "shall be in excess of and shall not contribute with such other insurance, except where such other insurance specifically applies as excess over this insurance." *Id.* at 396. After

evaluating the language of the U.S. Fire excess policy, the court determined that it "is not the kind of 'umbrella' policy that comes into play only when all other valid and collectible insurance has been exhausted. Instead, it applies when its underlying insurance has been exhausted." *Id*. at 399. This feature, together with the language of the endorsement, led the court to conclude that the Highlands and U.S. Fire policies should provide coverage before the Aetna policy. *Id*. (noting that in the absence of these facts the general rule would apply). In other words, the U.S. Fire policy was excess only to the Highlands policy, and Aetna's "other insurance" clause rendered it excess to the U.S. Fire policy. Similar analyses and results are seen in *AMHS Ins. Co. v. Mut. Ins. Co. of Arizona*, 258 F.3d 1090, 1099 (9th Cir. 2001); *Fed. Ins. Co. v. St. Paul Fire & Marine Ins. Co.*, 649 N.E.2d 460, 461 (Ill. App. 1995) ("[A]n excess insurance policy which specifically names the underlying policy to which it relates and makes no general reference to other policies operates as an excess policy only to the named primary carrier and not to any other primary policy which covers the insured."); and *Coffeyville Res. Ref. & Mktg., LLC v. Liberty Surplus Ins. Corp.*, 714 F. Supp. 2d 1119, 1129 (D. Kan.), *on reconsideration in part,* 748 F. Supp. 2d 1261 (D. Kan. 2010). *Cf. Cmty. Redevelopment Agency v. Aetna Cas. & Sur. Co.*, 57 Cal. Rptr. 2d 755, 761 n.6 (Cal. Ct. App. 1996), *as modified* (Nov. 13, 1996) ("If an excess policy states that it is excess over a specifically described policy and will cover a claim when that specific primary policy is exhausted, such language is sufficiently clear to overcome the usual presumption that *all* primary coverage must be exhausted."). *But see Horace Mann Ins. Co. v. Gen. Star Nat. Ins. Co.*, 514 F.3d 327, 333 (4th Cir. 2008) (concluding that a policy specifically excess to named

underlying policies was excess to all other insurance, including a primary policy with an "other insurance" clause); *Farmers Ins. Exch. v. Fed. Ins. Co.*, No. 10-611 JP/GBW, 2011 WL 13116736, at *10 (D.N.M. Nov. 21, 2011).

The question here is, therefore, whether the parties intended the First Mercury Standard Policy to be excess over only the AAIC Standard Policy or over *all* other insurance. Relevant features of the policy are: 1) it specifically names the AAIC Standard Policy (and several other policies) as "Underlying Insurance" and defines that term as only those policies shown in the declarations; 2) it provides that "[c]overage hereunder shall attach only after all Underlying Insurance has been exhausted by actual payment of claims or losses thereunder" and that "[i]n the event of exhaustion of the Underlying Insurance, this policy shall continue in force as primary insurance;" and 4) it "follows form" to the Underlying Insurance, i.e., the AAIC Standard Policy. [Doc. 116-6, pgs. 3-12] The First Mercury Standard Policy also provides that First Mercury

> shall provide the Named Insured with Insurance excess of the Underlying Insurance scheduled in the declarations page of this policy. Except as specifically set forth in the terms, conditions or endorsements of this policy, coverage shall apply in conformance with the terms, conditions and endorsements of the Underlying Insurance.

[Doc. 116-6, pg. 8]

Based on the repeated references to specific, defined "Underlying Insurance," attachment upon exhaustion of that specific insurance, and the provision that the First Mercury Standard Policy would continue as *primary* after exhaustion of the underlying insurance, the Court concludes that the First Mercury Standard Policy was intended to be excess to the named underlying insurance only, and not to all other insurance. *See 20th*

*Century Ins. Co. v. Liberty Mut. Ins. Co.*, 965 F.2d 747, 757 (9th Cir. 1992) (concluding that a policy was excess only to a named specific primary policy). Hence, the general rule that all primary policies must be exhausted before excess policies regardless of "other insurance" clauses does not operate here. To the extent it covers the same loss, the AAIC Bergstein Policy is excess over both the AAIC Standard and First Mercury Standard policies by operation of the "other insurance" clause. The next question is whether all three policies cover the same loss.

### iii.    *Whether Bergstein is an Additional Insured under the AAIC Standard Policy for its own Conduct*

The parties appear to agree that Bergstein was covered as an additional insured as an entity liable for Standard's conduct under Section II.A.1.c of the AAIC Standard Policy, which provides that an additional insured is '[a]nyone liable for the conduct of an insured described above but only to the extent of that liability." [Doc. 116-4, pg. 20, Sec. II.A.1.c; Doc. 138, pg. 8 n.1; Doc. 116, pg. 17-20] The parties also appear to agree that the relevant question as to direct liability is whether Bergstein is a "user" of the vehicle under the clause "anyone else while using with permission a covered auto you own, hire, or borrow." [Doc. 116-4, pg. 20, Sec. II.A.1.b; Doc. 116, pg. 17-20 (AAIC MSJ); Doc. 131 (First Mercury Response), pgs. 14-19; Doc. 146, pgs. 8-11] These clauses are known as "omnibus clauses." 8 STEVEN PLITT, ET AL., COUCH ON INS. § 111:1 (3rd ed. updated 2016) ("An 'omnibus clause' is a provision in an insurance policy that extends liability coverage to persons who use the named insured's vehicle with his or her permission.").

To reiterate, if Bergstein is a "user" of the tractor within the meaning of Sec.II.A.1.b, then it is insured for its direct liability under the AAIC Standard Policy as an additional insured.  If so, then the AAIC Standard Policy and Bergstein Policy insure the same loss and the same insureds, and, under the reasoning above, the "other insurance" clause in the AAIC Bergstein Policy operates to make it excess over the AAIC Standard Policy and the First Mercury Standard Policy.  AAIC therefore asks this Court to find that the undisputed facts establish that Bergstein is a "user" of the tractor.  In opposition, First Mercury maintains that Bergstein is not a "user" of the tractor and is not insured under the AAIC Standard Policy for its direct liability, and, therefore, the two policies do not cover the same loss and the "other insurance" clause in the AAIC Bergstein Policy is immaterial.

Absent an ambiguity in the contract, interpretation of a contract is a matter of law to be conducted by the Court.  *Mark V, Inc. v. Mellekas*, 1993-NMSC-001, ¶ 12, 114 N.M. 778, 845 P.2d 1232.  Whether an ambiguity exists is also a question of law that may be determined by the Court through examination of extrinsic evidence.  *Id*.  If an ambiguity exists, and "if the proffered evidence of surrounding facts and circumstances is in dispute, turns on witness credibility, or is susceptible of conflicting inferences, the meaning must be resolved by the appropriate fact finder."  *Id*.

Here, the parties have not identified any "collateral evidence of the circumstances surrounding the execution of the agreement" that indicates that "the language of the agreement is unclear."  *Id*.  Indeed, neither party has argued that the policies are ambiguous or asked the Court to resolve an ambiguity.  *See Great Am. Ins. Co. of N.Y. v.*

*W. States Fire Prot. Co.*, 730 F. Supp. 2d 1308, 1318 (D.N.M. 2009) (stating, "That the parties disagree about how the contract's language should be construed does not, on its own, create ambiguity" citing *Levenson v. Mobley,* 106 N.M. 399, 401, 744 P.2d 174, 176 (1987)). Instead, in their *Motions for Summary Judgment*, the parties requested that the Court construe the policies as a matter of law. [Doc. 114, 115] *See Great Am. Ins. Co. of N.Y.*, 730 F. Supp. 2d at 1318 (interpreting the contract as a matter of law where "[t]he parties . . . pointed to no factual disputes about the surrounding circumstances, nor ha[d] the [c]ourt discovered competing inferences, that would lead the [c]ourt to conclude that there is an ambiguity, the resolution of which turns on witness credibility" and "the parties . . . asked the [c]ourt to interpret the [c]ontract as a matter of law").

The Court "resolve[s] questions regarding insurance policies by interpreting their terms and provisions in accordance with the same principles which govern the interpretation of all contracts." *Ponder v. State Farm Mut. Auto. Ins. Co.*, 2000-NMSC-033, ¶ 11, 129 N.M. 698, 12 P.3d 960 (internal quotation marks and citation omitted). In doing so, the Court must "consider the plain language of the relevant provisions, giving meaning and significance to each word or phrase within the context of the entire contract, as objective evidence of the parties' mutual expression of assent." *United Nuclear Corp. v. Allstate Ins. Co.*, 2011-NMCA-039, ¶ 11, 149 N.M. 574, 252 P.3d 798 *rev'd on other grounds,* 2012-NMSC-032, 285 P.3d 644. "Contractual provisions in insurance policies must be interpreted in their usual, ordinary, and popular sense." *Id.* Moreover, the Court must "view the contract as a harmonious whole, give meaning to every provision, and accord each part of the contract its significance in light of other provisions." *Pub. Serv.*

*Co. of New Mexico v. Diamond D Const. Co.*, 2001-NMCA-082, ¶ 19, 131 N.M. 100, 33 P.3d 651.  Construction of one part of the policy should not "annul other parts of the document, unless there is no other reasonable interpretation." *Id.*

AAIC argues that Bergstein was a user of the tractor and trailer here because "Lyons acted on behalf of Bergstein . . . and his actions in the course and scope of employment were therefore alleged to be imputed to Bergstein [in the Udy Action]." [Doc. 116, pg. 18-19]  AAIC also argues that Bergstein "used the tractor and trailer because it was immediately involved in aspects of the safe operation of the [tractor] itself, including safety inspections and maintenance and regulatory compliance with safety regulations." [Doc. 116, pg. 19]

The Court observes that AAIC's first contention overlaps conceptually with the principle of vicarious liability.  However, the two clauses at issue here must be understood to encompass distinct realms of liability.  Otherwise, if Sections II.A.1.b (anyone using an owned vehicle) and II.A.1.c (liability for the conduct of the insured) cover the same people and conduct, they would be duplicative and one of them surplussage.  Consequently, to the extent AAIC relies on agency principles to argue that Bergstein was "using" the tractor under Section II.A.1.b, the Court is not persuaded that those assertions establish that Bergstein was covered for its *own* conduct as a user under the AAIC Standard Policy.  [*See, e.g.*, Doc. 116, pg. 18-19]

In support of its position that "use" includes management and oversight, AAIC points to several California cases standing for the proposition that "[t]o 'use' a vehicle does not even 'necessarily' entail the 'operation of the vehicle.'" [Doc. 116, pg. 19-20]

*See Glens Falls Ins. Co. v. Consol Freightways*, 51 Cal.Rptr. 789, 796 (Cal. Ct. App. 1966); *see, e.g.*, *Pacific Indemnity Co. v. Truck Insurance Exchange*, 76 Cal.Rptr. 281 (Cal. Ct. App. 1969). It also cites *In re Morga*, 31 B.R. 356, 360 (Bankr. D.N.M. 1983), in which the Court stated that "use" is construed broadly. [Doc. 138, pg. 8-9]

> The term "use," especially, is an ambiguous, general catch-all term, not necessarily limited to the ordinary use of the automobile. Moreover, the law in New Mexico is that terms used in an insurance policy and not . . . defined, must be construed liberally in favor of the insured and against the insurer, and that words, phrases, and terms must be given their ordinary meaning.

> Other cases cited include *Indus. Indem. Co. v. Cont'l Cas. Co.*, 375 F.2d 183, 184-85 (10th Cir. 1967), and *Earth Tech, Inc. v. U.S. Fire Ins. Co.*, 407 F. Supp. 2d 763, 764 (E.D. Va. 2006).

In spite of language in these cases seemingly indicating that the word "use" in omnibus clauses is extremely broad, close examination of all of these cases indicates that "use" is not as broad as AAIC argues. In each of these cases, a party was an "additional insured" under a clause similar to that here where there was some physical dynamic between that party, the vehicle, and the conduct that caused the accident. For instance, the very broad language in *Glens Falls Insurance Company* derives from a discussion of whether loading and unloading a truck constitutes "use" of the truck. 51 Cal.Rptr. at 795. Similarly, in *Earth Tech*, an Earth Tech employee was "operat[ing] as a flagman to direct [a] tractor-trailer and any oncoming traffic" while another person "attempted to back the vehicle into [a refinery complex]." *Earth Tech, Inc.*, 407 F. Supp. 2d at 765. Construing an omnibus clause identical to that here, the court determined that the Earth Tech

employee was "using" the tractor-trailer in that circumstance, although it noted that other courts had addressed similar issues with "mixed results." *Id.* at 766 & n.8. *See Indus. Indem. Co.*, 375 F.2d at 184 (A Johnson employee was "using" a Halliburton truck where the Johnson employee was driving a caterpillar that was towing the Halliburton truck); *In re Morga*, 31 B.R. at 360 (vehicle was being "used" within the terms of the policy where the driver was engaged in a game of "cat and mouse" with another vehicle); *Pac. Indem. Co.*, 76 Cal.Rptr. 281 (addressing whether a repair shop owner was using a truck where the truck's owner was repairing the truck in the shop).

The most compelling quotes cited by AAIC for the proposition that "use" "may include supervisory control" come from *Southern California Petroleum Corporation v. Royal Indemnity Company*, 1962-NMSC-027, ¶ 14, 70 N.M. 24, 369 P.2d 407, and *Insurance Company of North America v. Wylie Corporation*, 1987-NMSC-011, ¶ 14, 105 N.M. 406, 733 P.2d 84. [Doc. 138, pg. 9] In *Southern California*, the Court stated that "[i]t has been held that one employing an independent contractor may be using the vehicle of such independent contractor when such employer exercises supervisory control, at some time, over the vehicles or the movement thereof." *Id*. It went on, "The decisions recognize use . . . as encompassing the broader concept of employing or putting the vehicle to one's service by an act which assumes at any time—with the consent of the owner or his agent—the supervisory control or guidance of its movements." *Id*. (internal quotation marks and citation omitted). AAIC would have the Court construe this statement to encompass any level of supervisory control, no matter how attenuated from the actual operation of the tractor. This case ultimately is unpersuasive, however. First,

because the employing entity there did not "[ha[ve] the right to exercise any control over the use of its vehicles" and was "interested only in the result of the cementing operation but not in the methods or details of the work," it lacked the "control of the movement or operation of the vehicles . . .required to make the vehicles 'used by' it." *Id.* ¶ 15. Thus, the Court did not examine the contours of the control and the type of benefit that might make an employer a user of an independent contractor's vehicle.

Moreover, the cases for which the *Southern California* court cited the proposition stated above all involve more than management and oversight of operations. Like those discussed already, in each of those cases there was an immediate physical relationship between the vehicle, the accident, and the "user." *See Woodrich Const. Co. v. Indem. Ins. Co. of N. Am.*, 89 N.W.2d 412, 418 (Minn. 1958) (stating that "Woodrich, as the general contractor, assumed control of the truck in the congested area with the consent of [the] subcontractor[s] . . . who owned and drove the truck. Where, as an incident of and in the furtherance of his construction work, a general contractor assumes *active control or guidance of a backward movement of a truck* provided by a subcontractor, and his negligence in the exercise of that control and guidance is a proximate cause of the accident, the general contractor thereby *participates in the operation of the truck* to such an extent as to be a [u]ser of the vehicle." (Emphasis added.)); *Liberty Mut. Ins. Co. v. Steenberg Const. Co.*, 225 F.2d 294, 296 (8th Cir. 1955) (holding that "the *active directing* by the general contractor of the backward movement of the truck and the admitted following by the subcontractor's driver of the signals so given him . . . made the *participation* of the general contractor such *an immediate part* of the *actual operating* of

the truck as to constitute the general contractor, . . . a person 'using the automobile.'"
(Emphasis added.)); *Persellin v. State Auto. Ins. Ass'n*, 32 N.W.2d 644, 647 (N.D. 1948)
(holding that Persellin was an additional insured where he was driving the car);
*Hardware Mut. Cas. Co. v. Mitnick*, 26 A.2d 393, 394 (Md. 1942) (person was using the
vehicle where she was riding in it after letting someone else drive).

Similarly, in *Wylie*, Wylie hired an independent contractor, Jones, to drive a dump
truck. 1987-NMSC-011, ¶ 3. At the time of the accident, a Wylie employee was driving
a caterpillar that was pushing the Jones truck along a road bed. *Id*. While being so
pushed, the driver of the truck had "no control over the distance or speed his truck was
pushed." *Id*. The Court stated that "[i]f Wylie had the care, custody and control, even
partially, it must have had 'use' of the truck." *Id*. at ¶ 14. It went on, "The term 'use' in
a coverage clause of an insuring agreement is given a broad, general and comprehensive
meaning effecting broad coverage and it includes any exercise of control over the vehicle
*regardless of its purpose, extent, or duration*."). *Id*. Later, however, the Court stated that
"[s]ince Wylie was *working directly* on Jones's truck . . . Wylie was using the Jones
truck." *Id*. ¶ 15 (emphasis added). It also observed that "other cases strikingly similar to
the one at hand on their facts have declared that the activity of persons in *pushing,
towing, or otherwise manipulating a vehicle* owned by another constituted 'use' of the
temporarily immobile or disabled vehicle." *Id*. ¶ 14 (emphasis added). Given the facts in
*Wylie* and these later formulations of its holding, the Court concludes that, like in
*Southern California*, the broad statements quoted by AAIC must be understood in
context.

First Mercury argues in contrast that a person must be actually operating a vehicle in order to be "using" it. [Doc. 131, pg. 16]  *See, e.g.*, *Belser v. Rockwood Cas. Ins. Co.*, 2002 PA Super 27, ¶ 14 (2002) (stating that "a person must physically operate the vehicle, however briefly, in order to 'use' a vehicle."); *Colfax ex rel. Colfax v. Johnson*, 11 P.3d 1171, 1177 (Kan. 2000) (stating that "to constitute a 'use' or to be a 'user' under the policy, such as to be an insured, one must be operating the vehicle.").

The Court concludes that the positions advocated by the parties here are both too extreme.  First Mercury's position that use requires physical operation of the vehicle is inconsonant with the general principle that insurance policies should be construed broadly.  *Wylie*, 1987-NMSC-011, ¶ 14 ("The term 'use' in a coverage clause of an insuring agreement is given a broad, general and comprehensive meaning effecting broad coverage"); *see* 34 AM. JUR. PROOF OF FACTS 2D *Use of Motor Vehicle by Person Claiming Insurance Coverage* § 585 (2017) (stating that "the terms 'use' and 'using' are generally held to include but to be broader than the words 'driving' and 'operated' and that "[a]lthough a small minority of decisions appear to equate 'use' and 'operate,' it is widely recognized that while one who operates or drives a motor vehicle obviously uses it, one can use an automobile without driving or operating it.).

On the other hand, AAIC's position would obliterate any distinction between a "user" of a vehicle and one liable for the conduct of another, and could potentially sweep within its scope persons not contemplated by the parties to the policy.  *See Pub. Serv. Co. of New Mexico*, 2001-NMCA-082, ¶ 19 (stating that all provisions of a contract should be given effect); *Great Am. Indem. Co. of N.Y. v. Saltzman*, 213 F.2d 743, 747 (8th Cir.

1954) ("Of course if the term 'use' is construed to embrace all its possible meanings and ramifications, practically every activity of mankind would amount to a 'use' of something.").

The Court therefore declines to adopt either position proposed by the parties. Instead, the better approach is found in cases addressing the components that might constitute "use." As one court observed, "It is difficult and probably impossible to formulate an exact measure of the degree of control which a person not owning or driving the particular automobile must exercise over it in order to . . . be deemed entitled to the protection of automobile liability coverage." *Hake v. Eagle Picher Co.*, 406 F.2d 893, 896 (7th Cir. 1969). Nevertheless, courts have examined the extent to which the third party exerted control over the operation of the vehicle and "whether the vehicle was being operated to serve a purpose of the user." 34 AM. JUR. PROOF OF FACTS 2D *Use of Motor Vehicle by Person Claiming Insurance Coverage* § 585 (2017); *cf. BATS, Inc. v. Shikuma*, 617 P.2d 575, 577 (Haw. App. 1980) (stating that "[t]o determine whether a vehicle was 'used' by an insured where a third-party was actually operating the insured's vehicle, courts have analyzed two factors: (1) whether the vehicle was under the supervision and control of the insured, and (2) whether the vehicle was being operated to serve a purpose of the insured."). A review of cases addressing facts similar to those here indicates that while in theory a management company, such as Bergstein, might be a user of a vehicle owned by another so as to qualify as an additional insured, that status depends on the degree to which the company exerted control over and derived benefit from the operation of the vehicle. *Greentree Assocs. v. U.S. Fid. & Guar. Co.*, 607 A.2d

175, 178 (N.J. Super. Ct. App. Div. 1992) ("A common theme in decisions . . . that have considered whether a hired contractor's vehicles are being 'used' by the hirer is that unless *active or actual control* is asserted over the *guidance or operation of the vehicles*, the . . . hiring party will not be an additional insured." (Emphasis added.)); *Hake*, 406 F.2d at 895–96 ("[T]he owner or person in custody of premises has been deemed to be using the automobile, . . . where by signal[]ing directions to the driver the owner of the premises . . . has exercised immediate control over the movement of the automobile. Where the owner of the premises has exercise[d] little more control over the automobile than to invite it onto his premises for a designated objective, the owner has been held not to be using the automobile.").[1]

Because the present *Motions* are for summary judgment, the Court must determine whether the undisputed facts establish that Bergstein exercised sufficient control over the tractor to render it a user of the tractor.  AAIC maintains that they do.  As evidence, AAIC argues that "the Udy Plaintiffs proved at trial that Bergstein . . . used the [tractor] and trailer because it was immediately involved in aspects of the safe operation of the tr[actor] itself, including safety inspections and maintenance and regulatory compliance

---

[1] The Court notes that several courts have distinguished between "maintenance" and "use" and held that additional insureds under omnibus clauses similar to that here are limited to those using the vehicle, not those maintaining it.  *See, e.g.*, *Nationwide Prop. & Cas. Ins. Co. v. McFarland*, 887 S.W.2d 487, 494 (Tex. App. 1994*; State Farm Mut. Auto. Ins. Co. v. Pan Am. Ins. Co.*, 437 S.W.2d 542, 545 (Tex. 1969).  Under these cases, to the extent that Bergstein was responsible for maintaining the tractor as AAIC asserts, it would not qualify as an additional insured.  *Compare* Sec.II.A. ("We will pay all sums . . . resulting from the ownership, maintenance or use of a covered auto") *with* Sec. II.A.1.b (stating that an insured is "anyone else while using . . . a covered auto").  [Doc. 116-4, pg. 20]  Neither party advances an argument based on this reasoning.

with safety regulations." [Doc. 116, pg. 19] Even if such conduct constituted sufficient control over the operation of the tractor, AAIC's showing does not establish that this fact is undisputed. AAIC's argument is essentially that the judgment in the Udy Action is conclusive of the present question. "Collateral estoppel can bind an insurer to factual determinations made in a prior liability action against the insured in a subsequent declaratory judgment action to determine coverage issues." *Wear v. Farmers Ins. Co. of Washington*, 745 P.2d 526, 529 (Wash. Ct. App. 1987). Collateral estoppel requires "the existence of four elements: (1) the parties are the same or in privity with the parties in the original action; (2) the subject matter or cause of action in the two suits are different; (3) the ultimate facts or issues were actually litigated; and (4) the issue was necessarily determined." *Reeves v. Wimberly*, 1988-NMCA-038, ¶ 8, 107 N.M. 231, 755 P.2d 75. However, even if these elements are met, a judgment cannot be the basis for collateral estoppel if it is unclear from the verdict what the jury determined. *St. Paul Fire & Marine Ins. Co. v. Engelmann*, 639 N.W.2d 192, 199 (S.D. 2002) ("A court faces a conceptually impossible task in ruling on a summary judgment motion based on facts decided in another case in which multiple theories were presented and only a general verdict was rendered."). Here, the jury in the Udy Action was not asked in the special verdict form to indicate any factual findings nor were they asked whether Bergstein's liability was direct or vicarious. [Doc. 116-3, pg. 1-4] Although AAIC argues that the jury was instructed that "the plaintiffs state that Bergstein . . . maintained supervisory control and direct control and directed the management and employees of Zia . . . and Standard," this fact does nothing to clarify the verdict because the instruction includes

both theories.  [Doc. 116, pg. 5; Doc. 116-1, pg. 20]  Moreover, it is not clear how the jury was instructed as to damages for direct and vicarious liability.  *See* UJI 13-1827 (permitting award of punitive damages based on direct or vicarious liability).  In these circumstances, the verdict fails to establish what was proven, and, therefore, is not conclusive as to the issues before the Court.  *See Union Carbide Corp. v. Affiliated FM Ins. Co.*, 955 N.Y.S.2d 572, 575 (N.Y. App. Div. 2012) (no collateral estoppel where it was "impossible to discern exactly which facts, or acts of plaintiff, played a part in the jury's decision, or upon exactly which portion of the jury instruction (i.e., malice, oppression or fraud) the jury based its punitive damages award"); *Manard v. Hardware Mut. Cas. Co.*, 207 N.Y.S.2d 807, 809 (N.Y. App. Div. 1960) (no collateral estoppel where it was "impossible to determine from the general verdict . . . whether the determination was based upon an adverse finding by the jury on the issues of negligence or contributory negligence or whether it was based upon a finding of the absence of consent.").

Finally, although the existence and language of an agreement between Bergstein and Standard for "advisory, consulting and other services" is undisputed, the mere existence of the agreement does not elucidate Bergstein's relationship to the operation of the tractor.  [Doc. 116, ¶ 3; Doc. 131, ¶ 3; Doc. 116-3]  Indeed, the agreement provides that Bergstein will provide such services "in relation to the operations of [Standard], strategic planning, domestic and international marketing and financial oversight" and that Bergstein will select and supervise independent auditors, legal counsel, and investment bankers, and arrange incentives for key executives of Standard.  [Doc. 116-3]  Nothing in

the agreement mentions oversight of vehicles, safety protocols, or management of tractor drivers. The agreement is, therefore, not material to whether Bergstein was a "user" of the tractor.

In sum, the undisputed facts do not establish that Bergstein was a "user" of the tractor so as to bring it within the coverage of the AAIC Standard Policy as an additional insured for its own conduct. Consequently, it is not established that the AAIC Standard Policy and AAIC Bergstein Policy covered the same loss. In the absence of these facts, the Court cannot determine the priority of the policies as a matter of law.

*iv.    The Remaining Arguments*

Having determined that summary judgment as to the order in which the policies apply is inappropriate, the Court turns to the parties' remaining arguments. In large part, the remaining arguments depend on the order of the policies. Thus, since that issue cannot be summarily resolved, neither can these other arguments.

First, AAIC requests that the Court declare that the AAIC Bergstein Policy was not triggered until after the First Mercury Standard Policy was exhausted. This would be true if the AAIC Bergstein Policy is entirely excess to the First Mercury Standard Policy. Since this question has yet to be determined, the Court DENIES this request.

Second, AAIC requests summary judgment as to both of First Mercury's counterclaims for equitable subrogation and bad faith. Both of these claims depend on First Mercury's contention that the AAIC Bergstein Policy was primary, not excess, and thus AAIC had a duty to disclose it and tender its limits during settlement negotiations. The priority of the policies is unresolved. Moreover, a question of fact precludes

summary judgment on this issue.  AAIC presented evidence that a First Mercury adjuster discussed the AAIC Bergstein Policy with an AAIC adjuster in March, 2011, which indicates that AAIC was not concealing it from First Mercury.  [Doc. 116, pg. 10, ¶ 23; Doc. 131, pg. 6, ¶ 23; Doc. 116-6, pg. 38, ¶ 10; Doc. 116-6, pg. 1-2; Doc. 116-2, pg. 17, 79:13-25 (Pompeii Depo.)]   However, First Mercury maintains that any conversations about "a Bergstein policy" were in reference to a policy held by Bergstein Well Servicing, a separate entity from Bergstein.  [Doc. 131, pg. 6]  First Mercury provided an affidavit by Paul Neidich, who was a Supervisor of Umbrella Claims at First Mercury and who reviewed the Udy Action file.  [Doc. 131-1, pg. 1]  Neidich states in the affidavit that First Mercury's Udy Action claim file did not include the AAIC Bergstein Policy, but did include a policy for Bergstein Well Servicing.  [*Id*., pg. 2]  In addition, even in the deposition testimony by the First Mercury adjuster, on which AAIC relies, there is some ambiguity about which Bergstein policy she saw in the file and discussed with AAIC.  [Doc. 116-2, pg. 17, 79:13-25 ("[T]here was a Bergstein policy in our file, or some Bergstein entity, I think.")]  This conflict in the evidence creates a genuine issue of material fact on this issue.  This request will be DENIED.

Third, First Mercury moves for summary judgment in its favor on AAIC's affirmative claims for equitable subrogation and bad faith.  As a legal matter, like AAIC's similar claims, these claims hinge on when AAIC's obligations attached, which depends on whether the AAIC Bergstein Policy was primary or excess.  Hence, these claims cannot be summarily resolved on this basis.

First Mercury also argues that AAIC's equitable subrogation claim must be dismissed as a matter of law because "the doctrine of subrogation is inapplicable where the insurer seeking subrogation is itself primarily liable." [Doc. 117, pg. 12] But the authority cited for this proposition does not so hold. In *Builders and Manufacturers*, the Sixth Circuit Court of Appeals held that "[t]he rule that an insurer who has paid the loss resulting from a peril insured against may be subrogated to all the claims which the insured may have against any person [who negligently caused the injury] does not apply in a case where the [insured himself caused the] injury." *Builders & Mfrs. Mut. Cas. Co. v. Preferred Auto. Ins. Co.*, 118 F.2d 118, 121–22 (6th Cir. 1941). This merely means that an insurer cannot recover from its own insured where the insured paid the insurer to cover his negligence and was in fact negligent. *See Home Indem. Co. v. Shaffer*, 860 F.2d 186, 189 (6th Cir. 1988) ("[T]he rule preventing an insurer from exercising subrogation against its own insured stems from the fact that, in exchange for a premium, the insurer has accepted that risk that its own insured may negligently cause the loss."). Moreover, in *Builders*, the insurer had paid only the amount it contracted to pay through the policy. *Builders*, 118 F.2d at 121. Thus, the principle of subrogation, which permits recovery where the subrogated entity "paid the debt of another," did not apply because the insurer had not "paid the debt of another." *Dairyland Ins. Co. v. Herman*, 1998-NMSC-005, ¶ 23, 124 N.M. 624.

Neither party cites New Mexico authority which addresses the right of a primary insurer to equitable subrogation against an excess insurer. [Doc. 117, pg. 12, 17; Doc. 127] Neither does First Mercury explain why the doctrine would not apply to cases

where a primary insurer paid more than it was contracted to pay. In New Mexico, "[a] right to subrogation also exists if an insurance company pays a claim that should have been paid by another insurer." *Sw. Steel Coil, Inc. v. Redwood Fire & Cas. Ins. Co.*, 2006-NMCA-151, ¶ 7, 140 N.M. 720, 148 P.3d 806; *cf. SRM, Inc. v. Great Am. Ins. Co.*, 798 F.3d 1322, 1328 (10th Cir. 2015) ("[I]f an excess insurer, *like a primary insurer*, *fails to accept a reasonable settlement offer within its policy limits,* it may be liable to the other insurer for any *excess* liabilities under a claim for equitable subrogation." (first and third emphasis added, internal quotation marks and citation omitted)).

Moreover, here, AAIC's equitable subrogation argument is based on its assertion that the AAIC Bergstein Policy is excess to both of the other policies and that AAIC should not have been obliged to pay under that policy at all. Thus, in this sense AAIC's claim is that of an excess insurer, not a primary insurer. First Mercury is not entitled to summary judgment on this basis at this point.

Fourth, First Mercury moves for dismissal of AAIC's requests for declaratory judgment in the *First Amended Complaint*. [Doc. 117, pg. 19-20] In the *First Amended Complaint*, AAIC first asks the Court to declare that "under the principles of vertical exhaustion and pursuant to applicable contract provisions, the First Mercury policy limits must be exhausted before the Bergstein . . . Policy attaches." [Doc. 4, pg. 12] This request is a variation on AAIC's arguments for priority of the policies and has been adequately addressed in the context of those arguments. As with those arguments, this issue cannot be resolved on the current motions.

AAIC also included a claim titled "Declaratory Relief – Duty to Cooperate," within which AAIC asks very generally for a declaration of "the rights and other legal relationships of all parties to the instant litigation with respect to the issues raised by this Complaint." [Doc. 4, pg. 13] AAIC does not explain what "duty to cooperate" is owed by First Mercury. Assuming this phrase refers to some duty related to First Mercury's management of the claims and settlement, the reasoning in this Court's order dismissing Bergstein as a defendant applies here as well. [Doc. 33] "With limited exceptions . . . issuance of a declaratory judgment deeming past conduct illegal is . . . not permissible as it would be merely advisory. The Supreme Court has admonished that federal courts 'are not in the business of pronouncing that past actions which have no demonstrable continuing effect were right or wrong.'" *ACLU of Mass. v. United States Conference of Catholic Bishops*, 705 F.3d 44, 53 (1st Cir. 2013). "[D]eclaratory relief is inappropriate to adjudicate past conduct, such as when the damages have already accrued." 12 James Wm. Moore, MOORE'S FEDERAL PRACTICE § 57.04[3] (3d ed. 2013). Given that the parties to the underlying lawsuit settled the claims asserted in the underlying lawsuit, which was then dismissed with prejudice [Doc. 4-4], any harm to AAIC from First Mercury's alleged pretrial misconduct cannot recur, and therefore AAIC may not maintain an action for a declaratory judgment against First Mercury based on its alleged past misconduct. *See O'Connor v. Washburn Univ.*, 416 F.3d 1216, 1221 (10th Cir. 2005) (citing *Utah Animal Rights Coalition v. Salt Lake City Corp.*, 371 F.3d 1248, 1256-57 (10th Cir. 2004) for the proposition that "an action for declaratory relief was moot

when the requested declaration involved past conduct that was not likely to recur"). First Mercury's motion for summary judgment as to this claim will be GRANTED.

## III.    Conclusion

For the reasons stated herein, *AAIC's Motion for Summary Judgment on Priority and Applicability of Insurance Coverage and No Liability* will be denied. *First Mercury's Motion for Summary Judgment on AAIC's Affirmative Claims for Relief* will be denied, with the exception of that portion of First Mercury's motion related to AAIC's claim for declaratory judgment based on the duty to cooperate (Count IV), for which summary judgment will be granted.

**IT IS THEREFORE HEREBY ORDERED** that AAIC's *Motion for Summary Judgment on Priority and Applicability of Insurance Coverage and No Liability* [Doc. 116] is **DENIED**.

**IT IS FURTHER ORDERED** that First Mercury's *Motion for Summary Judgment on AAIC's Affirmative Claims for Relief* [Doc. 117] is **DENIED**, with the exception of that portion of First Mercury's motion related to AAIC's claim for declaratory judgment based on the duty to cooperate (Count IV), for which summary judgment is **GRANTED**.

**SO ORDERED this 31st day of March, 2017.**

_____

M. CHRISTINA ARMIJO
CHIEF UNITED STATES DISTRICT JUDGE