**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**


AMERICAN AUTOMOBILE INSURANCE
COMPANY,

       Plaintiff,

v.                                       No. 13:CV-439 MCA/LF

FIRST MERCURY INSURANCE COMPANY;
STANDARD E & S, LLC; ZIA TRANSPORT, INC.;
BERGSTEIN ENTERPRISES, LTD.,

       Defendants.


## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on AAIC's *Motion to Exclude Expert Testimony* [Doc. 114] and First Mercury's *Motion to Exclude Expert Testimony* [Doc. 118]. The Court has considered the parties' submissions and the relevant law, and is otherwise fully informed. For the following reasons, the Court **GRANTS in part** and **DENIES in part** both *Motions*, and sets forth the permissible parameters of the experts' testimony.

### I.   Background

The details of the underlying action and insurance policies at issue are described more fully in this Court's rulings on the parties' cross motions for summary judgment. In March, 2010, Kevin Udy was killed in an accident in which his pickup truck collided with a trailer being hauled by a tractor driven by Monte Lyons. Lyons was an employee of Standard E & S, LLC (Standard) and the tractor and trailer were owned by Zia

Transport, Inc. (Zia).  A year later, the personal representative of Udy's estate, along with Udy's wife and eight children, filed a wrongful death action against Lyons, Standard, and Zia (the Udy Action).  The plaintiffs also named Defendant Bergstein Enterprises, Ltd (Bergstein), the management company for Standard and Zia, as a defendant in the Udy Action.  [Doc. 117-1 (*Udy Action Complaint*)]

Three insurance policies are at issue.  Two were issued by AAIC and one by First Mercury.  First, the AAIC Standard Policy had a limit of $1 million and covered Standard as a named insured.  Second, the First Mercury Policy was an excess policy and had a limit of $4 million.  The AAIC Standard Policy was named as "underlying insurance" to the First Mercury Standard Policy.  Third, the AAIC Bergstein Policy had a limit of $1 million and covered Bergstein as a named insured.

Although the parties disagree as to whether AAIC properly tendered the policy limits on the AAIC Standard Policy to First Mercury, they agree that First Mercury took the lead in settlement negotiations with the Udy plaintiffs.  [Doc. 116, ¶¶ 18-19, 21 (asserting that AAIC tendered its limits on the AAIC Standard Policy to First Mercury and that First Mercury "took control" of the negotiations); Doc. 131, ¶¶ 18-21 (disputing that AAIC properly tendered its limits but agreeing that First Mercury "took over the primary role" in negotiations); Doc. 116-2, Exh. H & I, pgs. 25-27]  During the negotiations, First Mercury offered the Udy plaintiffs the $1 million available under the AAIC Standard Policy, but did not offer the entire $4 million available under the First Mercury Standard Policy.  [Doc. 116, ¶ 27 (asserting these facts); Doc. 131, ¶ 27 (not disputing these facts); Doc. 116-2, Exh. J, pg. 29; Doc. 116-6, Exh. 133, pg. 20]  No

funds from the AAIC Bergstein Policy were offered during negotiations. [Doc. 131, pg. 11, ¶ Y (stating that AAIC offered the Bergstein Policy limit after the verdict); Doc. 138, pg. 6, ¶ Y (not disputing this assertion); Doc. 131-9]

After a jury trial, judgment was entered against Standard, Zia, and Bergstein for a total of $58 million, including $30,300,000 against Standard and $22,050,000 against Bergstein. [Doc. 116, ¶ 29 (asserting these facts); Doc. 131, ¶ 29 (not disputing these facts); Doc. 116-3, Exhs. 1-2] The case was then settled for $43 million, which was paid as follows: $1 million by AAIC pursuant to the AAIC Standard Policy; $4 million by First Mercury pursuant to the First Mercury Standard Policy; $1 million by AAIC pursuant to the AAIC Bergstein Policy; $4 million by Commerce and Industry pursuant to an excess policy to the AAIC Bergstein Policy, which is not at issue here; and $33 million by First Mercury and its liability insurers. [Doc. 116, ¶ 30 (asserting these facts); Doc. 131, ¶ 30 (not disputing these facts)]

AAIC filed a *Complaint for Declaratory Judgment, Bad Faith, and Equitable Subrogation* against First Mercury, Standard, Zia, and Bergstein, as well as the Udy plaintiffs. [Doc. 1] The *Complaint* alleged that First Mercury breached its duty of good faith and fair dealing by failing to settle with the Udy plaintiffs within policy limits, and that AAIC is entitled to equitable subrogation and declaratory relief. [Doc. 4] In its suit, AAIC seeks $1 million, which represents the amount of the AAIC Bergstein Policy that AAIC paid as a result of First Mercury's failure to settle the Udy Action within the limits of the AAIC Standard Policy and First Mercury Standard Policy. [Doc. 4, ¶¶ 30-32] In the *First Amended Complaint for Declaratory Judgment, Bad Faith, and Equitable*

*Subrogation (First Amended Complaint)*, AAIC dismissed the Udy plaintiffs, leaving First Mercury, Standard, Zia, and Bergstein as defendants. [Doc. 4] Standard, Zia, and Bergstein were then dismissed from the suit for failure to state a claim against them. [Doc. 33] Thus, First Mercury is the only remaining defendant. [*Id.*]

First Mercury answered the *First Amended Complaint* and counterclaimed against AAIC, alleging that AAIC acted in bad faith by, *inter alia*, failing to notify First Mercury of the AAIC Bergstein Policy. [Doc. 13] First Mercury maintains that, if AAIC had disclosed the AAIC Bergstein Policy earlier in the negotiations, "the Udy Action likely would have settled prior to trial within policy limits." [Doc. 13, ¶ 25] First Mercury seeks equitable and punitive damages. [Doc. 13, ¶¶ 28, 32] Both parties now move to exclude the other's expert witness. [Doc. 114, 118]

## II. Rule 702 and Expert Testimony

Rule 702 imposes a special gatekeeping obligation on this Court to ensure that expert testimony is not admitted at trial unless it is both relevant and reliable. *See Kumho Tire Co., Ltd v. Carmichael*, 526 U.S. 137, 141 (1999); *Daubert v. Merrell-Dow Pharm., Inc.*, 509 U.S. 579, 592-93 (1993). The relevance of such testimony also must be weighed against "the danger of unfair prejudice, confusion of the issues, or misleading the jury" as well as "considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403.

The Federal Rules of Evidence provide that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or

education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702 (2000).

"A two-part test applies to determine admissibility. First, the district court must determine "whether the expert is qualified 'by knowledge, skill, experience, training, or education' to render an opinion." *Conroy v. Vilsack*, 707 F.3d 1163, 1168 (10th Cir. 2013) (internal quotation marks and citation omitted); *see* Fed. R. Evid. 702). Second, the court "must satisfy itself that the proposed expert testimony is both reliable and relevant, in that it will assist the trier of fact, before permitting a jury to assess such testimony." *Id.* (internal quotation marks and citation omitted).

While the Court is not required to consider any particular set of factors or utilize a particular procedure in making such determinations with respect to expert testimony, the Court must make *some* kind of determination on the record in order to demonstrate that it has performed its gatekeeping function. *See United States v. Velarde*, 214 F.3d 1204, 1209 (10th Cir. 2000); *Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1088 (10th Cir. 2000). "The proponent of expert testimony bears the burden of showing that its proffered expert's testimony is admissible." *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009).

The first question is whether the expert is qualified to testify as to the proposed opinions. Generally speaking, "[a]s long as an expert stays within the reasonable confines of his subject area, our case law establishes a lack of specialization does not

affect the admissibility of [the expert] opinion, but only its weight." *Compton v. Subaru of Am., Inc.*, 82 F.3d 1513, 1520 (10th Cir. 1996) (internal quotation marks and citation omitted) overruled on other grounds by *Kumho Tire Co., Ltd.,* 526 U.S. 137. Thus, the qualifications necessary to opine in a given case depend on the issues in that case. In other words, the question before the Court is whether the specific issues to be addressed by the expert fall within the "reasonable confines of [the expert's] subject area." *See, e.g.*, *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 (10th Cir. 2001) (assessing whether a proposed expert, while qualified in orthopedic surgery, was qualified to give opinions related to the specific technique at issue). It is the proponent's burden to "connect the proverbial dots" between the expert's general expertise and the issues pertinent to the case. *Conroy*, 707 F.3d at 1169.

In making the second determination—whether the proposed testimony is reliable—"generally, the district court should focus on an expert's methodology rather than the conclusions it generates." *Nacchio*, 555 F.3d at 1241 (internal quotation marks and citation omitted). Under *Daubert*, courts typically assess "1) whether a theory or technique can be tested; 2) whether it has been subjected to peer review and publication; 3) the known or potential error rate of the theory or technique; and 4) whether the theory or technique enjoys general acceptance within the relevant scientific community. *United States v. Hankey*, 203 F.3d 1160, 1167 (9th Cir. 2000) (citing *Daubert*, 509 U.S. at 592–94). But "[t]he *Daubert* factors (peer review, publication, potential error rate, etc.) simply are not applicable to [nonscientific] testimony, whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory

behind it." *Hankey*, 203 F.3d at 1169; *Hangarter v. Provident Life and Acc. Ins. Co.*, 373 F.3d 998, 1017 n.14 (9th Cir. 2004) (addressing reliability of expert testimony as to industry standards); *State v. Torrez*, 2009-NMSC-029, ¶ 21, 146 N.M. 331, 210 P.3d 228 (stating that "when testing the reliability of non-scientific expert testimony, rather than testing an expert's scientific methodology as required under *Daubert* and *Alberico,* the court must evaluate a non-scientific expert's personal knowledge and experience to determine whether the expert's conclusions on a given subject may be trusted.").

Rule 702 provides that an expert may "testify in the form of an opinion." Moreover, "[a]n opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a). However, while "[a]n expert witness may testify regarding an ultimate issue of fact" the expert "may not offer an opinion that 'articulates the ultimate principles of law governing the deliberations of the jury.'" *Spendrup v. Am. Family Mut. Ins. Co.*, No. 13-CV-00513-KLM, 2014 WL 656862, at *3 (D. Colo. Feb. 20, 2014) (quoting *Specht v. Jensen,* 853 F.2d 805, 808 (10th Cir. 1988) (en banc)). "An expert witness may refer to the law so long as he does not state legal conclusions drawn by applying the law to the facts." *Spendrup*, 2014 WL 656862, at *3 (internal quotation marks and citation omitted). In addition, expert testimony should be excluded "when the purpose of [the] testimony is to direct the jury's understanding of the legal standards upon which their verdict must be based." *Specht,* 853 F.2d at 810. "In no instance can a witness be permitted to define the law of the case." *Id*. On the other hand, mere reference to legal matters does not render the testimony inadmissible: "a witness may

properly be called upon to aid the jury in understanding the facts in evidence even though reference to those facts is couched in legal terms." *Id.* at 809.

## III.   Analysis

The Court, here, fulfills its gatekeeping function.  The parties should keep in mind, however, that the rulings stated herein, based upon the proffers made, are subject to reconsideration in the event that unforeseen events or a change in context should occur during the trial.  For this reason, at trial, the parties are directed to notify the Court outside the presence of the jury before eliciting expert testimony on disputed topics, so that the opposing party has a fair opportunity to renew an objection and the Court may issue a timely ruling on such renewed objections.

## A.  <u>Qualifications</u>

Both parties challenge the qualifications of the other's expert.  Because the Court will rule that the proposed testimony on contract interpretation and priority of the policies is inadmissible, it need not address the experts' qualifications to opine on those matters. It will therefore address the experts' qualifications to opine on claims handling and bad faith.

### 1.  <u>Charles D. Henderson</u>

As to claims handling, AAIC argues that "Mr. Henderson's 'extensive experience' in claims handling does not include experience in New Mexico claims handling practices and his assertion that claims handling is similar in New Mexico as elsewhere is unsupported."  [Doc. 136, pg. 2]   AAIC points to *City of Hobbs v. Hartford Fire Insurance Company*, in which the Tenth Circuit stated that "[t]hough a proffered expert

possesses knowledge as to a general field, the expert who lacks specific knowledge does not necessarily assist the jury." 162 F.3d 576, 587 (10th Cir. 1998). The Tenth Circuit held that the district court did not abuse its discretion in excluding expert testimony on bad faith where the expert did not have expertise in New Mexico claims handling. *Id.*; *see also Garcia v. Metro. Life Ins. Co.*, 859 F. Supp. 2d 1229, 1232 (D.N.M. 2012) (excluding expert testimony on bad faith because, inter alia, the expert did not have experience in New Mexico). Other Tenth Circuit cases, however, have held that "[a]s long as an expert stays within the reasonable confines of his subject area, our case law establishes a lack of specialization does not affect the admissibility of the expert opinion, but only its weight." *Compton*, 82 F.3d at 1520; *cf. Conroy*, 707 F.3d at 1168–69 (stating that "the court correctly looked to whether [a particular topic] was 'within the reasonable confines' of [the expert's] expertise"); *see also King v. Allstate Ins. Co.*, No. 11-CV-00103-WJM-BNB, 2013 WL 3943607, at *7 (D. Colo. July 31, 2013) (stating that where "there is no evidence showing that Colorado's regulations are materially different than states in which [the expert] has significant training and experience" and "also no evidence showing that the regulations governing the Colorado insurance industry are materially different from those states," "[the expert's] lack of training, qualifications, and experience with Colorado's insurance industry do not make him unqualified to serve as an expert.").

Mr. Henderson's *curriculum vitae* indicates that he holds degrees in organizational management and business administration-finance. [Doc. 114-6, pg. 23-24] He began working in the insurance industry in 1974 as a claims adjuster, and continued to work in

progressively more responsible claims adjustment/claims management positions until 2002, when he formed Henderson Consulting. [Doc. 114-6, pg. 21-23] In several positions Mr. Henderson had oversight of auto and uninsured/underinsured motorist claims. [Doc. 114-6. Pg. 22-23] From 1976 to 1981, Mr. Henderson was a claims adjuster for Automobile Rental Insurance and Services and was responsible for the western region, including New Mexico. [Doc. 130-1, ¶ 4] From 1986 to 1999, he was a Home Office Claim Superintendent at CIGNA, and again was responsible for the western region, including New Mexico. [Doc. 130-1, ¶ 5] He stated in an affidavit that he has "specific claims handling experience in New Mexico." [Doc. 130-1, ¶ 3] Although he acknowledges that there may be "legal peculiarities" in New Mexico law, he asserts that these peculiarities "are not at issue in this case." [Doc. 130-1, ¶ 3] He has testified over two hundred times in the United States, including on claims handling and bad faith. [Doc. 114-6, pg. 21]

The Court finds that Mr. Henderson is qualified by experience and training as an expert in claims handling. Even if Mr. Henderson's affidavit attesting to experience with New Mexico claims processing is vague, as AAIC argues [Doc. 136, pg. 3], the extent to which he is familiar with New Mexico-specific claims handling procedures and practices is fodder for cross-examination. AAIC may "cross-examine Mr. [Henderson] on his [New Mexico]-specific experience, training, and qualifications and . . . argue to the jury that the lack thereof means that the jury should afford his opinions less weight than the expert opinions proffered by [AAIC]." *King*, 2013 WL 3943607, at \*7.

2.  <u>Thomas Rushton</u>

First Mercury challenges Mr. Rushton's qualifications to testify about claims handling.  [Doc. 118, pg. 6]  It argues that "Mr. Rushton's list of qualifications does not show any recent experience in the insurance industry . . . that would pertain to the handling of commercial automobile insurance claims."  [Doc. 118, pg. 6]  Mr. Rushton holds degrees in philosophy and law and his experience includes five years as a claims adjuster in New Mexico, four and a half years as an attorney in private practice in New Mexico focusing on insurance defense, and twenty-one years as the Chief Deputy Superintendent of Insurance in New Mexico.  [Doc. 118-2]  While a claims adjuster, he worked on claims related to commercial trucking accidents and auto claims.  [Doc. 118-4, Rushton Depo., 15:8-20]  While Chief Deputy Superintendent, he was responsible for providing guidance to all Insurance Department staff, overseeing handling of medical malpractice claims against the New Mexico Patients Compensation Fund, supervising settlement negotiations with the Fund, and determining whether to accept or decline settlement offers related to coverage under the Fund, among other things.  [Doc. 118-2]

Given that Mr. Rushton has experience adjusting auto claims, the Court understands First Mercury's argument to be that his experience is stale, having been gained over twenty-five years ago.  The Court is not persuaded that this fact renders Mr. Rushton unqualified to testify here.  Since his position as claims adjuster, Mr. Rushton has been continuously involved with the insurance industry, including claims handling, albeit in the medical malpractice arena.  Moreover, he has been responsible for aspects of settlement negotiations and interactions between primary and secondary insurers, both of

which are relevant to the issues presented here.  Finally, First Mercury "has presented nothing to suggest that the field has undergone dramatic recent change that would render Mr. [Rushton]'s knowledge and experience too stale."  *Owens v. Amtrol, Inc.*, 94 F. Supp. 2d 952, 955 (N.D. Ind. 2000).  The Court finds that Mr. Rushton is qualified to testify on claims handling.

**B.  Opinions**

Having concluded that Mr. Henderson and Mr. Rushton are qualified to opine on claims handling, the Court turns to the substance of the proposed testimony.  The reports submitted by the experts in large part mirror each other.  Both reports share three sections in common, addressing:  1) construction of the policies and opinions on the priority order of the policies, 2) the timeline of claims handling events from the accident through the verdict in the Udy Action, and 3) the experts' opinion on whether the other party acted in bad faith in handling the claim and negotiating settlement.  [Doc. 114-5, pg. 17-28; Doc. 118-1, pg. 1-15]  Both parties propose to offer their experts' opinion on the interpretation of the policies and whether the other party acted in bad faith.  [Doc. 118-1, pg. 1 (scope of Mr. Rushton's report); Doc. 62; Doc. 130, pg. 2; *see* Doc. 114-5, pg. 3 (stating the scope of Mr. Henderson's report)]  The Court will therefore address the admissibility of testimony on each topic in turn.

1.  Contract Interpretation

Although First Mercury states in its *Response* to AAIC's *Motion to Exclude Testimony of Charles D. Henderson* that "Mr. Henderson is not being offered to provide an opinion on the interpretation of insurance contracts under New Mexico law," [Doc.

130, pg. 17] Mr. Henderson's report is replete with his construction of the three policies at issue. [Doc. 114-5, pg. 14 n.5, 17, 18, 19] Similarly, the first portion of Mr. Rushton's report consists of a summary of New Mexico case law pertaining to interpretation of insurance contracts, particularly primary and secondary policies. [Doc. 118-1, pg. 1-4] Mr. Rushton also sets forth features of each policy pertaining to its relation to the others, and his opinions as to the priority order of the policies. [Doc. 118-1, pg. 2-4]

The experts' focus on the priority of the policies is to be expected, since, as explained more fully in this Court's discussion of the parties' cross-motions for summary judgment in the *Memorandum Opinion and Order* filed on March 31, 2017 [Doc. 162] both parties' bad faith claims are predicated in large measure on the insurers' understanding of the order of priority of the three insurance policies. In other words, whether AAIC had a duty to disclose the AAIC Bergstein Policy upon initiation of settlement negotiations in the Udy Action, for example, depends on whether that policy was primary or excess over the other policies. Thus, Mr. Henderson's opinions as to AAIC's claims handling are based on his opinions on how the policies should be interpreted. Mr. Rushton's opinions on claims handling are also founded on his understanding of the priority of the policies.

The experts' testimony on construction of the policies will not be admitted. Absent an ambiguity in the contract, interpretation of a contract is a matter of law to be conducted by the Court. *Mark V, Inc. v. Mellekas*, 1993-NMSC-001, ¶ 12, 114 N.M. 778, 845 P.2d 1232. Whether an ambiguity exists is also a question of law that may be determined by the Court through examination of extrinsic evidence. *Id*. If an ambiguity

exists, and "if the proffered evidence of surrounding facts and circumstances is in dispute, turns on witness credibility, or is susceptible of conflicting inferences, the meaning must be resolved by the appropriate fact finder." *Id*.

Here, the parties have not identified any "collateral evidence of the circumstances surrounding the execution of the agreement" that indicates that "the language of the agreement is unclear." *Id*. Indeed, neither party has argued that the policies are ambiguous or asked the Court to resolve an ambiguity. *See Great Am. Ins. Co. of N.Y. v. W. States Fire Prot. Co.*, 730 F. Supp. 2d 1308, 1318 (D.N.M. 2009) ("That the parties disagree about how the contract's language should be construed does not, on its own, create ambiguity" citing *Levenson v. Mobley,* 1987-NMSC-102, ¶ 7, 106 N.M. 399, 744 P.2d 174 (1987)). Instead, in their *Motions for Summary Judgment*, the parties requested that the Court construe the policies as a matter of law, [Doc. 116, 117] and the Court has done so to the extent construction does not depend on determination of facts. [Doc. 162] *See Great Am. Ins. Co. of N.Y.*, 730 F. Supp. 2d at 1318 (interpreting the contract as a matter of law where "[t]he parties . . . pointed to no factual disputes about the surrounding circumstances, nor ha[d] the [c]ourt discovered competing inferences, that would lead the [c]ourt to conclude that there is an ambiguity, the resolution of which turns on witness credibility" and "the parties . . . asked the [c]ourt to interpret the [c]ontract as a matter of law").

The proffered testimony as to construction of the policies and their priority order is a statement of law that infringes on the Court's sole duty to define the law. *See Specht,* 853 F.2d at 810 (stating that "[i]n no instance can a witness be permitted to define the law

of the case"); *Employers Reinsurance Corp. v. Mid-Continent Cas. Co.*, 202 F. Supp. 2d 1212, 1217 (D. Kan. 2002) (stating that if there is no ambiguity, expert testimony on contract interpretation is improper). Neither expert will be permitted to testify as to interpretation of the policies, including who is insured under each policy, the operation of the "other insurance," omnibus, or other clauses in the policies, or other topics going to the priority of the three policies at issue. *See Gallatin Fuels, Inc. v. Westchester Fire Ins. Co.*, 410 F. Supp. 2d 417, 421 (W.D. Pa. 2006) (excluding testimony on insurance policy construction and application).

They may, however, testify about the general purposes and functions of primary and excess policies, general principles of claims handling, and other general foundational aspects of insurance that would be helpful to the jury in this case, as long as such testimony is relevant and complies with the other rules of evidence. In doing so, the experts may "aid the jury in understanding the facts in evidence even though reference to those facts is couched in legal terms." *Specht*, 853 F.2d at 809-10 (stating that "an expert's testimony is proper under Rule 702 if the expert does not attempt to define the legal parameters within which the jury must exercise its fact-finding function.").

2. Good Faith and Fair Dealing

A significant portion of the proposed testimony pertains to the insurers' processing of the Udy claim and alleged bad faith. To prepare his report and form his opinions, Mr. Henderson relied on twenty-two different sets of documents. [Doc. 114-6, pg. 30] The report includes a detailed timeline of events in the Udy Action and AAIC's and First Mercury's management of the claim. Throughout the timeline, Mr. Henderson provides

his opinion of the reasonableness *vel non* of the insurers' handling of the claim. [*See, e.g.*, Doc. 114-5, pg. 29, 30; 114-6, pg. 2, 4, 6, 7, 10, 11, 12, 14, 15] Mr. Henderson states several times that AAIC's actions were "unreasonable and violated accepted industry standards, practices, and procedures" without stating what those standards, practices, and procedures are or who promulgated them. [*See, e.g.*, Doc. 14-5, pg. 29, 30; Doc. 114-6, pg. 7, 11, 15] He also states that AAIC "breach[ed] the Guiding Principles for Primary and Excess Insurers," [Doc. 114-6, pg. 11, 15] and cites two such principles, including a "duty of investigating promptly and diligently even those cases in which it is apparent that its policy limits may be consumed" and duty to "give prompt written notice to the excess insurer, when known, stating the results of investigation and negotiation." [Doc. 114-6, pg. 15]

Mr. Henderson also states that "it is clear from [the] timeline" that AAIC "violated multiple provisions of [] N[MS]A 1978, § 59A-16-20," including subsections (a), (b), (c), and (e) of that statute. [Doc. 114-5, pg. 29] Mr. Henderson states that "[i]t is equally clear from the events [shown in the timeline] that First Mercury's handling of the claim was reasonable." [Doc. 114-5, pg. 29] Finally, Mr. Henderson states several times that AAIC "breached the duty of good faith and fair dealing." [Doc. 114-5, pg. 29; 114-6, pg. 15]

Similarly, Mr. Rushton's report includes six pages summarizing case law on insurance bad faith. [Doc. 118-1, pg. 5-11] Next, he provides a detailed timeline of events from the accident to the jury verdict. [Doc. 118-1, pg. 11 to 118-2, pg. 8] At various points in the timeline, Mr. Rushton provides his subjective evaluation of the

handling of the Udy claims.   [*See, e.g.*, Doc. 118-1, pg. 14, 15; 118-2, pg. 1, 2]   In addition, Mr. Rushton provides six pages in which he describes in detail First Mercury's conduct that allegedly constitutes bad faith.  [Doc. 118-2, pg. 8-14]

Both experts' reports set out their experience, the facts about the accident and Udy Action, a timeline of events and communications related to claims handling, case law, and contract terms as a basis for their opinions.  The level of detail in the timelines and each expert's evaluation of the insurers' conduct throughout the timelines provides the requisite tie between the experts' experience, the facts relied on, and their opinions.  *See Kumho Tire Co.*, 526 U.S. at 156 (stating that "an expert might draw a conclusion from a set of observations based on extensive and specialized experience"); Fed. R. Evid. 702 advisory committee's note to the 2000 amendments ("In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony.").  The Court finds that the proposed testimony based on this analysis is reliable.

In addition, to the extent either expert references industry standards and best practices, several courts have held that the reliability of such testimony on industry standards "is dependent upon the witness's knowledge of, and experience within, the insurance industry."  *Hangarter*, 373 F.3d at 1017 n.14.  Thus, such testimony was reliable where the expert's knowledge of the standards was grounded in his experience. *Id*. at 1018; *cf. Am. Nat. Prop. & Cas. Co. v. Cleveland*, 2013-NMCA-013, ¶ 27, 293 P.3d 954 (holding that the district court did not err in admitting testimony where the expert "had not properly stated [an insurer]'s own standards for the investigation and

processing of claims, how [the insurer] failed to meet those standards, and how [the insurer]'s actions differed from industry standards" in his affidavit).

Mr. Henderson and Mr. Rushton both have extensive experience in the insurance industry. Mr. Henderson has worked for six different insurance companies and has held several leadership positions with the Federation of Defense and Corporate Counsel. [Doc. 114-6, pg. 21-24] He is a member of the Society of Registered Professional Adjusters. [Doc. 114-6, pg. 24] In his work for the Superintendent of Insurance, Mr. Rushton advised supervisors of the investigations and consumer complaints units and reviewed the more complicated cases that arose through those channels. [Doc. 144-1, Rushton Depo., 35:2-36:4] He worked with the claims adjusters for the New Mexico Patients Compensation Fund on approximately sixty medical malpractice claims per year. [Doc. 144-1, Rushton Depo., 40:14-41:22] He attended quarterly meetings of the National Association of Insurance Commissioners and served on several task forces, including some addressing excess insurer issues. [Doc. 144-1, Rushton Depo., 45:3-11] The Court finds that both Mr. Henderson and Mr. Rushton have the breadth of experience and knowledge necessary to render testimony on industry standards reliable. *See Hangarter*, 373 F.3d at 1016, 1018 (holding that the district court properly considered the expert's twenty-five year experience in the insurance industry in assessing the reliability of his testimony on industry standards).

The Court now turns to the particulars of the proposed testimony related to bad faith. Whether an insurer had a duty to deal in good faith with its insured and with other insurers is a question of law to be determined by the Court. *Azar v. Prudential Ins. Co. of*

*Am.*, 2003-NMCA-062, ¶ 43, 133 N.M. 669, 68 P.3d 909 ("The existence of a duty, . . . remains a question of law for the trial court to determine and is answered by reference to legal precedent, statutes, and other principles comprising the law."). Moreover, whether an insurer breached that duty is a matter to be determined by the jury upon application of the law to the facts. *R.A. Peck, Inc. v. Liberty Fed. Sav. Bank*, 1988-NMCA-111, ¶ 12, 108 N.M. 84, 766 P.2d 928 ("Once it has been determined that a duty exists as a matter of law, then any claimed breach of that duty presents a question of fact to be resolved by the trier of fact.").

Therefore, neither expert may testify as to whether AAIC or First Mercury had a duty to the other, or whether they breached that duty, as the Court will instruct on the former and the jury will determine the latter. The experts may not characterize the actions of either as being in "bad/good faith," or "reasonable" or "unreasonable." Instead, they may testify as to facts relevant to good faith, such as industry standards for claims handling, typical practices and procedures, and the facts behind the parties' claims handling in this case. *See Gallatin Fuels, Inc.*, 410 F. Supp. 2d at 421 (permitting expert testimony on "insurance claims adjusting procedure [and] an insurer's compliance with industry customs and standards"); Rule 13-1705 NMRA (stating that "what is customarily done by those engaged in the insurance industry is evidence of whether the insurance company acted in good faith. However, the good faith of the insurance company is determined by the reasonableness of its conduct, whether such conduct is customary in the industry or not. Industry [customs] [standards] are evidence of good or bad faith, but they are not conclusive."). They may testify about interactions between

primary and secondary insurers. With respect to § 59A-16-20, the experts may testify as to what the statute provides. They may testify about AAIC's or First Mercury's actions vis á vis the statutory requirements and the methods used by insurers to comply with the statute, but may not testify that the insurers violated the statute. To draw conclusions as to whether AAIC breached a duty or violated the statute would "circumvent[] the jury's decision-making function by telling it how to decide the case." *Specht*, 853 F.2d at 808; *see AXIS Specialty Ins. Co. v. New Hampshire Ins. Co.*, No. 15-0809-CV-W-ODS, 2017 WL 445746, at *2 (W.D. Mo. Feb. 2, 2017) (permitting an expert to testify along these lines).

Of course, at all times an expert's testimony is subject to the requirement that expert testimony must be helpful to the jury. *Werth v. Makita Elec. Works, Ltd.*, 950 F.2d 643, 648 (10th Cir. 1991) (stating that "the 'touchstone' of admissibility is helpfulness to the trier of fact"). Expert testimony that "would not even marginally assist the trier of fact, . . . must be viewed as a 'needless[] present[ation]'" of evidence. *Thompson v. State Farm Fire & Cas. Co.*, 34 F.3d 932, 941 (10th Cir. 1994) (quoting Fed. R. Evid. 403). Hence, the testimony by Mr. Henderson and Mr. Rushton should pertain to aspects of the insurance industry that are beyond the jury's ken, as there is no need for expert testimony on issues that the jury is perfectly "capable of assessing for itself." *Id*. The issues here involve, among other things, the roles and interactions between primary and secondary insurers, as well as evaluations of the likelihood of settlement with the Udy plaintiffs. Expert testimony is appropriate to assist the jury in understanding these issues. *See Gallatin Fuels, Inc.*, 410 F. Supp. 2d at 421.

3.  Other Topics

As to the reasonableness of First Mercury's reliance on Paul Yarbrough's assessment of the Udy claims, Mr. Henderson first sets out the "generally accepted insurance practices for insurers seeking advice of counsel," including the source of those standards, [Doc. 114-7, pg. 2] then compares the contents of Mr. Yarbrough's report against those standards.  [Doc. 114-7, pg. 3-6]  Mr. Henderson concludes that Mr. Yarbrough's report contains the required contents and that it "arrives at reasonable conclusions and evaluations based on the information available to Mr. Yarbrough." [Doc. 114-7, pg. 6]  Ultimately, Mr. Henderson concludes that "it was reasonable for First Mercury to have relied on Mr. Yarbrough's analysis and evaluations in the handling of the Udy claim."  [Doc. 114-7, pg. 6]  Thus, Mr. Henderson articulated the standards for such reports and explained how he evaluated the report against those standards to reach his conclusions.  The Court finds Mr. Henderson's analysis on this point to be reliable.

Other than general arguments about Mr. Henderson's lack of qualifications to opine about claims handling practices, AAIC makes no objection to Mr. Henderson's proposed testimony about Mr. Yarbrough's report or the reasonableness of First Mercury's reliance thereon.  [Doc. 114, 136]  Testimony about the standards for such evaluations and whether the report provides information consistent with those standards is properly admitted under Rule 702.

## IV. Conclusion

**IT IS THEREFORE ORDERED THAT** for the reasons stated herein, AAIC's *Motion to Exclude Expert Testimony* [Doc. 114] is **DENIED in part and GRANTED in part**, as set out above.

**IT IS FURTHER ORDERED THAT** First Mercury's *Motion to Exclude Expert Testimony* [Doc. 118] is **DENIED in part and GRANTED in part**, as set out above.

**SO ORDERED this 30th day of September, 2017.**

_____
M. CHRISTINA ARMIJO
Chief United States District Judge